## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHEN DISTRICT OF OHIO
### WESTERN DIVISION

JANA LYNN BLEDSOE,                          :          Case No. 3:13-CV-01263

    Plaintiff,                              :

        vs.                             :

CAROLYN W. COLVIN,                      :
ACTING COMMISSIONER OF SOCIAL SECURITY                    MEMORANDUM DECISION AND
                                                             :          ORDER
    Defendant.

### I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties

in this case have consented to have the undersigned Magistrate Judge conduct all proceedings in this

case, including ordering the entry of final judgment.  Plaintiff seeks judicial review of Defendant's

final determination denying her claim for Disability Insurance Benefits (DIB) under Title II the

Social Security Act (Act).  Pending are the Briefs on the Merits filed by the parties and Plaintiff's

Reply (Docket Nos. 13, 14 & 15).  For the reasons set forth below, the Magistrate affirms the

Commissioner's decision.

### II. PROCEDURAL BACKGROUND.

On January 29, 2010, Plaintiff, with the assistance of the Social Security Administration,

completed an application for DIB alleging that she became unable to work because of her disabling

condition on December 18, 2009 (Docket No. 12, pp. 80-81 of 451).  The application was denied

initially and upon reconsideration (Docket No. 12, pp. 67-69; 71-73 of 451).

Plaintiff's request for hearing was granted and on November 17, 2011, Plaintiff, represented by counsel, and Vocational Expert (VE) Carl Hartung, appeared before Administrative Law Judge (ALJ) Henry B. Wansker (Docket No. 12, p. 17 of 451).  On December 20, 2011, the ALJ issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Act from the date her impairment began through the date of the ALJ's decision (Docket No. 12, pp. 12-22 of 451).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on April 25, 2013 (Docket No. 12, pp. 4-6 of 451).

Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).  Defendant filed an Answer (Docket No. 11).

### III. PLAINTIFF'S HEARING TESTIMONY.

Plaintiff was 50 years of age, 5'3" tall and she weighed 230 pounds.  Plaintiff attained a certificate of high school equivalency through general educational equivalency testing.  Plaintiff resided with her husband (Docket No. 11, pp. 40-41 of 451).

Plaintiff did not stop working because she was ill; she stopped working in order to spend time with her family.  During this respite from employment, Plaintiff was diagnosed with breast cancer (Docket No. 11, pp. 41-42 of 451).

In May 2010, Plaintiff completed chemotherapy after having a bilateral mastectomy, reconstructive surgery, an implant exchange and the removal of capsular contracture[1] around the breast implant.  Plaintiff was undergoing nipple reconstruction (Docket No. 12, pp. 48-49 of 451).

The side effects of the chemotherapy were hair loss, nausea, vomiting, fatigue, weakness,

---

[1] A complication of breast implant surgery, characterized by discomfort, retraction of the fibrous capsule around a implant, with induration/hardening and/or distortion.  Http://medical-dictionary.thefreedictionary.com/capsular+contracture.

joint pain and an aversion for drinks containing red dye.  The chronic nausea and loss of her hair were emotionally devastating.  As a result of this entire ordeal, Plaintiff developed anxiety and discomfort in social situations.  Because her muscles were cut, Plaintiff had difficulty reaching up or lifting with both hands (Docket No. 11, pp. 50-54 of 451).

There were days when Plaintiff questioned her mortality, she was fatigued and she was not motivated to get out of bed.  Periodically Plaintiff had mood swings and angry outbursts.  Plaintiff had commenced psychological counseling/therapy integrated with drug therapy.  The drug therapy included prescriptions of Abilify®, Ambien, Buspirone, Lexapro® and Trazodone.  Except for the occasional episode of excitability and the inability to sleep, the side effects from these medications were negligible (Docket No. 11, pp. 46; 47; 54; 56 of 451).

Plaintiff babysat once or twice weekly during which time she cared for, entertained, nurtured and disciplined her grandchildren (Docket No. 11, pp. 43-44 of 451).  There was a direct correlation between whether she completed household chores and Plaintiff's daily physical and emotional health (Docket No. 11, p. 57 of 451).  Plaintiff took a nap daily for up to 1½ hours (Docket No. 11, p. 58 of 451).  Plaintiff did not go to the store by herself (Docket No. 11, p. 58 of 451).  Occasionally, Plaintiff would go camping with her entire family and converse with her friends by telephone. Plaintiff was unable to walk a half block or otherwise exercise because of knee pain and crepitus. She had been prescribed Mobic for knee pain (Docket No. 11, pp. 45; 57 of 451).

## IV. THE VE'S HEARING TESTIMONY.

The VE, a vocational rehabilitation consultant, affirmed that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a universal classification of occupational definitions and how such occupations are performed, and its companion publication, SELECTED

3

CHARACTERISTICS.  Plaintiff's counsel was "comfortable with the VE's reliance on this data" (Docket No. 12, pp. 37-38 of 451).

The VE categorized Plaintiff's past relevant work as defined by the DOT code and its physical demand requirement (as Plaintiff performed it), skill level and specific vocational preparation requirement:

| JOB/DOT | PHYSICAL DEMAND | SKILL LEVEL | SPECIFIC VOCATIONAL PREPARATION LEVEL |
|---|---|---|---|
| Fast food manager DOT 185.137-010 | Light level of exertion which involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  It requires a good deal of standing and walking. 20 C. F. R. § 4-4/1567(b). | Low end of skilled work, requiring qualifications in which a person uses judgment to determine the machine and manual operations to be performed to obtain the proper form, quality or quantity of material to be purchased.    20 C. F. R. § 404.1568 (c). | The amount of time required by the typical worker to learn the techniques, acquire the information and develop the facility for average performance of this job is over 6 months up to and including 1 year. |
| Nurse assistant DOT 355.674-040 | Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying objects weighing 50 pounds or more. 20 C. F. R. § 404.1567(e). | | The amount of time required by the typical worker to learn the techniques, acquire the information and develop the facility for average performance of this job is over 3 months up to and including 6 months. |

(Docket No. 12, pp. 38-39 of 451).

The ALJ posed the <u>first</u> hypothetical to the VE:

Assume an individual of Plaintiff's age, educational background and work experience, capable of lifting and carrying a maximum of 20 pounds occasionally and ten pounds frequently; could stand and walk for six of eight hours in an 8-hour workday and that this person could sit for six of eight hours in an 8-hour work day; push and pull without limitations except insofar that she would be frequency and weight restricted and her weight capacity. . . . could lift and carry; assume she could occasionally stoop, kneel, crouch, crawl and perform overhead reaching bilaterally; assume that she could not climb ladders, ropes, or scaffolds or be exposed to unprotected heights; under the provisions of this hypothetical could our hypothetical person perform Plaintiff's past work activity or any other?

The VE opined that this hypothetical person could perform Plaintiff's past relevant work of

4

fast food manager as it was generally done (Docket No. 11, pp. 59-60 of 451).

The ALJ posed the <u>second</u> hypothetical to the VE:

If our hypothetical person were unable to sustain an 8-hour work day, five days per week, would she be capable of performing Plaintiff's past work activity?

The VE explained that "it's not a matter of capacity of performing it, by definition it's not full-time work" (Docket No. 11, p. 60 of 451).

Plaintiff's counsel posed the <u>third</u> hypothetical to the VE:

Assume someone of the same physical capabilities outlined in the hypothetical one but added that the individual may be off task up to 20% of the work day due to excessive worry and racing thoughts that Plaintiff has testified to, would that individual be able to do the type of jobs that you listed before?

The VE responded simply "No." A person who exceeded the 20% threshold would be unable to perform Plaintiff's past work activity but all the work activity too (Docket No. 11, pp. 61-62; 63 of 451).

Plaintiff's counsel posed the <u>fourth</u> hypothetical to the VE:

Assume someone of the same physical capabilities outlined in the hypothetical one but added that the individual would be missing up to three days a month due to depressive symptoms of being unable to leave their bedroom or their house, would that individual be able to do the jobs that you listed?

The VE responded that it was not a mater of doing the jobs but a matter of having an unacceptable number of absences from the work place. The average number of acceptable absences is 1½ days per month. A person who exceeded the average would be unable to perform Plaintiff's past work activity but "all the work activity too" (Docket No. 11, pp. 62; 63 of 451).

**V. MEDICAL EVIDENCE.**

The following medical evidence provided by Plaintiff summarizes her physical and mental

impairments.

1.    PHYSICAL HEALTH TREATMENT

The comparison of the radiological views of Plaintiff's breast taken on December 16, 2006 and May 14, 2009, showed that she had developed a new hypoechoic[2] mass which the examiner felt was more complex than a simple cyst.  An ultrasound confirmed this abnormality (Docket No. 12, pp. 176-177; 178-179 of 451).

Plaintiff underwent a biopsy of the left breast mass on December 18, 2009.  The pathology results confirmed the presence of cancer in the glandular tissues which was invasive and poorly differentiated.  However, the surgical margins were negative for tumor and no lymph vascular invasion was identified (Docket No. 12, pp. 165-166; 170-171; 173; 191-192 of 451).

On December 31, 2009, Dr. John W. McDonough, III, M. D., a surgeon performed a left modified radical mastectomy with ancillary lymph node dissection (Docket No. 12, pp. 181-182; 192-193 of 451).  Upon review of the pathology results of the representative sections of the breast, Dr. McDonough referred Plaintiff to an oncologist (Docket No. 12, pp. 183-184; 188-189 of 451; www.vitals.com/doctors/Dr_John_W_McDonough/profile.

On January 21, 2010, Dr. Seong I. Kim, an oncologist, conducted a comprehensive assessment of Plaintiff's clinical and physical histories as well as the healthiness of vital organs. On February 4, 2010, Dr. Kim began administering the anti-cancer drugs, carefully monitoring its effect[3].  Plaintiff completed this course of treatment on May 26, 2010 (Docket No. 12, pp. 203; 204-

---

2

A region in an ultrasound image in which the echoes are weaker or fewer than normal or in the surrounding regions. STEDMAN'S MEDICAL DICTIONARY 19500 (27th ed. 2000).

3

On this date, Dr. Kim also completed a MEDICAL FUNCTIONAL CAPACITY ASSESSMENT and a BASIC MEDICAL form for the Job and Family Services in which he determined that Plaintiff had some moderate and marginal limitations in understanding and memory, social interaction and adaptation.  Later he acknowledged that he was not qualified to perform such evaluation (Docket No.

205; 206-207; 208-218; 373-384 of 451; www.healthgrades.com/physician/dr-seong-kim-3yfnsl).
On July 9, 2010, Plaintiff's breast tissue showed no masses, densities or calcifications to suggest
malignancy (Docket No. 12, pp. 231-232 of 451).

Results from tests administered on August 12, 2010, showed elevated cholesterol levels.  On
September 15, 2010, Plaintiff presented to Dr. Carmen Skinner, D.O., who diagnosed and treated
Plaintiff for essential hypertension and hyperlipidemia.  Otherwise, Plaintiff had few complaints,
she reported feeling fine and she was primarily concerned about whether to take a vaccine for
whooping cough (Docket No. 12, pp. 220-222; 223-224 of 451).

On August 25, 2010, Dr. Arthur Kumpf, a board certified plastic surgeon, conducted a
review of Plaintiff's medical history in contemplation of breast reconstruction surgery (Docket No.
12, pp. 370-371 of 451; www.healthgrades.com/physician/dr-arthur-kumpf-xs7w6)).

On September 8, 2010, Dr. Kumpf discussed with Plaintiff the risks and benefits of breast
reconstruction surgery (Docket No. 12, pp. 367-368 of 451).

Dr. Arthur Sagone, M. D., conducted an assessment of Plaintiff's physical residual functional
capacity (RFC) on September 21, 2010.  Based on his reasoned judgment and consideration of all
evidence in the record, Dr. Sagone determined that Plaintiff had no visual or communicative
limitations and that she could/should:

- Occasionally lift and/or carry twenty pounds.
- Frequently lift and/or carry ten pounds.
- Stand and/or walk about six hours in an 8-hour workday.
- Sit with normal breaks for a total of about six hours in an 8-hour workday.
- Push and/or pull on an unlimited basis.
- Occasionally stoop, kneel, crouch and crawl but she could never balance.
- Reach in all directions including overhead on a limited basis.

---

12, pp. 398-399 of 451).  On the BASIC MEDICAL form, Dr. Kim admitted that Plaintiff was limited in the ability to walk, sit or stand
by her impairment.  It was his opinion that Plaintiff could lift and/or carry up to five pounds frequently and occasionally (Docket
No. 12, pp. 400-401 of 451)

● Avoid even moderate exposure to hazards.

(Docket No. 12, pp. 246-253 of 451).

Plaintiff elected to undergo breast reconstruction and on November 1, 2010, a temporary tissue expander was inserted[4] (Docket No. 12, p. 341 of 451).  The blood work from November 2, 2010, showed essentially a normal complete blood count (CBC) and chemical panel.  At that time, Dr. Kim was not alarmed by the presence of tumor markers[5] (Docket No. 12, pp. 321-323 of 451)).

The chest X-ray taken on December 1, 2010, showed no active chest disease (Docket No. 12, p. 446 of 451).

On December 7, 2010, Plaintiff underwent a right simple mastectomy, bilateral breast reconstruction with expander implants and placement of AlloDerm[6](Docket No. 12, pp. 344; 347-348; 364-365; 449-451 of 451).  Five days postoperative bilateral reconstruction, Plaintiff was progressing well, in a good mood and was moving well (Docket No. 12, p. 340 of 451).

On April 21, 2011, Plaintiff was recovering well and she had no pain with the expander placement.  Plaintiff requested that the exchange operation be delayed for five weeks so that she could attend a social event (Docket No. 12, p. 330 of 451).

On May 24, 2011, Dr. Kumpf performed the bilateral silicone implant exchange and

---

[4]

A common breast reconstruction technique is tissue expansion, which involves expansion of the breast skin and muscle using a temporary tissue expander.  A few months later, the expander is removed and the patient receives either microvascular flap reconstruction, or the insertion of a permanent breast implant.  This type of breast reconstruction requires two separate operations. Www hopkinsmedicine.org.

[5]

A substance, released into the circulation by tumor tissue, whose detection in the serum indicates the presence of tumor. STEDMAN'S MEDICAL DICTIONARY 240620 (27th ed 2000).

[6]

AlloDerm® is a patented tissue matrix created from donated human skin.  It has several reconstructive applications and when placed in the body, it provides a foundation for new tissue regeneration.  Http://breastreconstruction.org.

capsulotomy[7].  The surgery was successful (Docket No. 12, pp. 342-343 of 451).

On July 26, 2011, Dr. Kim noted that clinically, Plaintiff was progressing well.  He was concerned that the presence of a marker indicated the presence of a tumor.  Dr. Kim planned to test and observe further (Docket No. 12, pp. 315-316 of 451).

On June 14, 2011, Plaintiff presented to Dr. Skinner with complaints that she snored "more often."  Diagnosed with hypertension and obesity, Dr. Skinner recommended that Plaintiff lose weight (Docket No. 12, pp. 350-352 of 451).

Blood samples were collected on August 16, 2011, for purposes of conducting a CBC.  Dr. Kim was satisfied that the CBC was essentially normal and the elevated tumor marker was attributed to the previous surgery (Docket No. 12, pp. 410-413 of 451).

On August 30, 2011, Dawn Sperling, a certified nurse practitioner (CNP), addressed Plaintiff's complaints of chronic bilateral knee pain.  Plaintiff was prescribed Mobic (Docket No. 12, pp. 408-409 of 451).

On September 7, 2011, Plaintiff complained of severe pain after she started an intense exercise program that included walking 1.5 miles.  Dr. Antonio Rosario, M. D., considered the radiographic evidence from September 1, 2011, and diagnosed Plaintiff with bilateral osteoarthritis. He also suggested a systematic approach to walking, reducing the current schedule by 50% and then increasing it by increments of 10%.  Dr. Rosario suggested that Plaintiff apply ice following exercise (Docket No. 12, pp. 403-405; 406 of 451).

**2.  MENTAL HEALTH TREATMENT.**

Plaintiff presented to the MARION INDEPENDENT PHYSICIAN'S ASSOCIATION where Dr.

---

[7]

Division of a capsule as around a breast implant.  STEDMAN'S MEDICAL DICTIONARY 62700 (27th ed. 2000).

Joseph Spare, M. D., a psychiatrist, supervised Robin Mines, a licensed social worker, Robin

Siefker and Christopher J. Kalb, both CNPs, in counseling Plaintiff and/or conducting her

medication check:

- July 10, 2010, Lexapro® was prescribed and two weeks later, Plaintiff reported that it worked well for depression (Docket No. 12, pp. 234-238 of 451).
- August 21, 2010, Lexapro® controlled the symptoms of depression and Trazodone was added to assist with sleeping (Docket No. 12, pp. 240-242 of 451).
- September 18, 2010, Plaintiff was sleeping well and she did not feel depressed. Neither did she entertain feelings of self harm (Docket No. 12, pp. 243-245 of 451).
- October 29, 2010, Lexapro® controlled the symptoms of depression and she could identify what caused her depressed mood (Docket No. 12, pp. 309-311 of 451).
- November 13, 2010, the increased dosage of Lexapro® resulted in no symptoms of depression (Docket No. 12, pp. 306-308 of 451).
- January 8, 2011, the dosages of medication were working well except that the dosage of Trazodone was increased to assist with sleeping (Docket No. 12, pp. 303-304 of 451).
- January 31, 2011, Plaintiff discussed her depression and self image regarding the mastectomy (Docket No. 12, pp. 301-302 of 451).
- February 14, 2011, Plaintiff was allowed to vent about her husband's anger issues; Plaintiff's sleep habits and appetite had been maintained (Docket No. 12, pp. 299-300 of 451).
- February 23, 2011, Plaintiff was experiencing mood swings with depression. Abilify® was added to the drug regimen to help with mood swings (Docket No. 12, pp. 297-298 of 451).
- March 23, 2011, Plaintiff was still experiencing days of mood instability mixed with anger and frustration (Docket No. 12, pp. 294-295 of 451).
- April 8, 2011, Plaintiff was feeling better and her mood was pleasant, her sleep and appetite were maintained (Docket No. 12, pp. 291-292 of 451).
- April 22, 2011, Plaintiff vented and a discussion was had about the use of appropriate coping skills and adapting cognitive restructuring.  Ambien was added to the treatment regimen (Docket No. 12, pp. 288 -289 of 451).
- April 25, 2011, Dr. Spare administered the MINNESOTA MULTIPHASIC PERSONALITY INVENTORY-2.  Plaintiff's valid clinical profile showed a significant elevation on the restructured clinical scale which was indicative of mild but chronic levels of depression (Docket No. 12, pp. 312-314 of 451).
- May 5, 2011, Plaintiff reported that her mood was stable and her symptoms controlled (Docket No. 12, pp. 286-287 of 451).
- May 19, 2011, Plaintiff vented and a discussion was had about the use of appropriate coping skills and adapted cognitive restructuring (Docket No. 12, pp. 284-285 of 451).
- June 2, 2011,Plaintiff reported that her mood was stable and her symptoms controlled (Docket No. 12, pp. 281-283 of 451).

10

- June 16, 2011, Plaintiff reported that she was doing well and that her mood was stable (Docket No. 12, pp. 272-273 of 451).
- July 7, 2011, Plaintiff's most recent mood was "good"; she was not depressed or angry and her sleep and appetite were maintained. Plaintiff concentrated on the therapeutic tools used to improve her mood despite complaints of anhedonia, depression most the day, decreased energy, decreased sexual interest and difficulty concentrating (Docket No. 12, pp. 268-271; 274-280 of 451).
- August 18, 2011, Plaintiff concentrated on her therapeutic tools for improving her functioning; adjusting her coping mechanisms; identifying her stressors and improving communication and relaxation skills and she also underwent a medication check (Docket No. 12, pp. 414-417; 418-421 of 451).
- September 1, 2011, Plaintiff underwent a medication check (Docket No. 12, pp. 422-424 of 451).
- September 2, 2011, although the symptoms had improved since her last visit, Plaintiff still complained of anhedonia, depression most of the day, decreased energy, and decreased sexual interest. Plaintiff was allowed to vent and encouraged to work on self-awareness and cognitive restructuring (Docket No. 12, pp. 425-428 of 451).
- September 15, 2011, Plaintiff discovered that she had arthritis; otherwise, she was doing well and there were no serious problems to report (Docket No. 12, pp. 429-430 of 451).
- September 16, 2011, Plaintiff continued to experience a depressed mood and difficulty concentrating even though her symptoms had improved since her previous visit (Docket No. 12, pp. 432-434 of 451).
- September 29, 2011, Plaintiff admitted that her symptoms fluctuated depending on her pain levels and stress. Her mood was gradually improving (Docket No. 12, pp. 435-438 of 451).
- October 10, 2011, Plaintiff's familial conflict had resolved itself. Plaintiff's mood was stable and her symptoms were controlled (Docket No. 12, pp. 441-442 of 451).

Dr. Todd Finnerty, Psy. D., completed the PSYCHIATRIC REVIEW TECHNIQUE evaluation, a form that describes symptoms or behaviors to be checked as present or absent for the nine categories of disorders, for the period of December 18, 2009 through October 25, 2010. Diagnosing Plaintiff with "possible depressive symptoms," Dr. Finnerty opined that Plaintiff's impairments themselves were not severe. When rating the functional limitations otherwise known as the "B" criteria of the Listing, Dr. Finnerty opined that Plaintiff had mild limitations in the restriction of activities of daily living; mild limitations in difficulties in maintaining social functioning; mild limitations in difficulties in maintaining concentration, persistence or pace and no episodes of decompensation,

each of extended duration (Docket No. 12, pp. 254-266 of 451).

## VI.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS.

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

12

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VII. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings of fact:

1. At step one, Plaintiff met the insured status requirements of the Act through December 31, 2014.  She had not engaged in substantial gainful activity since June 4, 2010, the alleged onset date.

2. At step two, Plaintiff had six severe impairments:

   - A history of an adenocarcinoma of the left breast (December 2009).
   - A history of a left breast radical mastectomy with lymph node dissection (December 2009)
   - A history of an elected contralateral mastectomy with bilateral breast reconstruction and expander implants (December 2010).
   - A history of bilateral implant exchange and capsulotomy.
   - Mild bilateral osteoarthritis of the knees.
   - Obesity.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  And Plaintiff had the RFC to perform less than a full range of light work with the following abilities and limitations:

   - Able to lift and carry 20 pounds occasionally and 10 pounds frequently.
   - Able to stand and walk of 6 hours in an 8-hour work day.
   - Able to sit for 6 hours in an 8-hour workday.
   - Able to push and pull without limitation, except insofar as frequency and weight

13

restricted in her capacity to lift and carry.
- Limited to occasional stooping, kneeling, crouching, crawling and overhead reaching bilaterally.
- Precluded from climbing ladders, ropes or scaffolds and from exposure to unprotected heights.

4. At step four, Plaintiff is capable of performing past relevant work as a fast food service worker. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

5. Plaintiff had not been under a disability, as defined in the Act, from December 18, 2009 through December 20, 2011 (Docket No. 12, pp. 17-22 of 451).

## VIII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). A district court's review is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*,

14

574 F.2d 359 (6th Cir. 1978)).  If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Consequently, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  The ALJ's decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IX. PLAINTIFF'S ARGUMENTS.

Plaintiff argues that the ALJ committed reversible error by failing to properly:

1.  Assess Plaintiff's severe impairments of depression and anxiety.
2.  Account for the symptoms of depression and anxiety in assessing RFC.
3.  Assess Plaintiff's credibility.

Defendant counters that:

1.  There is no merit to Plaintiff's claim that her depression and severity are severe.
2.  Plaintiff was not fully credible.

## X. DISCUSSION.

### A    SEVERE IMPAIRMENTS.

Plaintiff argues that the ALJ erred when he failed to find that her symptoms of depression and anxiety were severe.

### 1. IS PLAINTIFF'S MENTAL IMPAIRMENT CONSIDERED SEVERE UNDER THE ACT?

The regulations provide that an impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . "  20 C.F.R. §§ 404.1520(c); 416.920(c) (Thomson Reuters 2013).  Basic work activities include:

- Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling.
- Capacities for seeing, hearing, and speaking.
- Understanding, carrying out, and remembering simple instructions.
- Use of judgment.
- Responding appropriately to supervision, co-workers, and usual work situations.
- Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (Thomson Reuters 2013).  An impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988); *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89–90 (6th Cir.1985).  This construction of Section 404.1520(c) is intended to insure that the Commissioner does not "deny meritorious disability claims without proper vocational analysis."  *Higgs*, *supra,* 880 F.2d at 862 (citation omitted).  The function of the severity requirement is to screen out claims that, based on the medical record, are totally groundless. *Id*. at 863; *Farris*, 773 F.2d at 90.

To determine whether a mental impairment significantly limits a claimant's ability to do one or more basic work activities, the Commissioner assesses the degree of limitation that the mental impairment imposes on four functional areas:

16

- Activities of daily living.
- Social functioning.
- Concentration, persistence or pace.
- Episodes of decompensation.

20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3) (Thomson Reuters 2013).

These four functional limitations are known as the "B" criteria.  The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The regulations require the ALJ to attach a point value to each of the four functional areas.  20 C.F.R. §§ 404.1520a(c)(4) (Thomson Reuters 2013).  For the first three categories, the regulations set forth a five-point assessment scale:  none, mild, moderate, marked, and extreme.  *Id.*  The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four or more.  *Id.*  If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled.  *Rabbers v. Commissioner of Social Security*, 582 F.3d 647, 653 (6th Cir.2009) (*quoting* 20 C.F.R. § 404.1520a(d)(1)).

Here, the ALJ properly acknowledged the relevant legal standard found at 20 C.F.R. §§ 404.1520a(a); 416.92a(a).  The ALJ evaluated Plaintiff's pertinent symptoms, signs, and laboratory findings to determine that Plaintiff had medically determinable mental impairments (the A criteria).  Then the ALJ attached a point value to each of the four functional areas (the B criteria).  Consistent with Dr. Finnerty's analysis, the ALJ determined that the functional limitations were not incompatible with the ability to do gainful activity.  Additionally, there was no objective evidence that Plaintiff had any recent episodes of decompensation.  Finding that the B criteria was not satisfied, the ALJ assessed the degree of functional limitation that any additional impairments imposed to determine if they significantly limited Plaintiff's physical or mental ability to do basic

17

work activities (the C criteria). There was no objective evidence that additional impairments caused limitations that were "severe" as defined in 20 C. F. R. §§ 404.1520(c) and 416.920(c); consequently, the ALJ appropriately found that the additional impairments did not impose significant work-related limitations of function (Docket No. 12, pp. 18; 19 of 451).

Essentially, the ALJ found that Plaintiff responded well to medication and counseling and that she had no significant limitations from her mental impairment. This finding is based on the evidence which does not show that there is more than a minimal limitation in Plaintiff's ability to do basic work activities. The Magistrate is persuaded that the ALJ did not err at Step 2 of the sequential evaluation because he discussed, weighed and analyzed whether Plaintiff's mental impairment was severe. Because he followed the procedural rules and his decision is based on substantial evidence, this Court is precluded from reaching a different conclusion about whether Plaintiff's mental impairment is severe.

### 2. INCLUSION OF THE MENTAL IMPAIRMENT IN PLAINTIFF'S RFC.

Plaintiff argues that the RFC found by the ALJ does not account for any mental restrictions, in spite of voluminous records supporting such limitations.

Pursuant to 20 C.F.R. §§ 404.1523 and 416.923:

"In determining whether your physical or mental impairment or impairments are of a sufficient medical severity . . . we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."

Pursuant to 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2):

"If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your RFC.

18

RFC is what an individual can still do despite his or her functional limitations and restrictions caused by his or her medically determinable physical or mental impairments.  TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, Social Security Ruling (SSR) 96-9p, 1996 WL 374185, *1 (July 2, 1996).  It is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities.  *Id.*

There is no mechanical rule in the Sixth Circuit regarding the manner in which mild functional limitations must be accounted for in a RFC.  Here, ALJ began by considering the severity of Plaintiff's mental impairment and because there was a finding of severity as to even one other impairment, the ALJ was bound to consider the combined effect of all impairments.  In other words, once the ALJ determined that Plaintiff suffered from severe physical impairments, he was required to consider the impairments resulting from this condition and Plaintiff's depressive symptoms in assessing RFC at steps three and four of the sequential evaluation.

In formulating the RFC, the ALJ considered Plaintiff's mental disorders contained in broad categories found in paragraph "B" of the adult mental disorders in 12.00 of the Listing of impairments.  The ALJ completed the remaining steps in the disability determination and properly considered Plaintiff's non-severe condition in determining whether she retained sufficient RFC to allow her to perform substantial gainful activity.

There is no evidence that Plaintiff's mental condition deteriorated after Dr. Spare concluded that Plaintiff was only slightly depressed, sleeping fairly well, had stabilized moods with no serious problems and her symptoms were controlled with medication, placing her within the mild range of

19

impairment, at worst (Docket No. 12, pp. 268-280; 435-438; 441-442 of 451).  The evidence shows that Plaintiff did not seek out further mental health treatment, that she did not avoid all social interaction and that her depression did not limit her ability to perform some work-related activities. such as babysitting.  The ALJ gave full weight to the opinion of Dr. Finnerty, who performed the only consultative psychological evaluation based solely on Dr. Spare's reports which showed that Plaintiff had mild psychological symptoms or difficulty with social or occupational functioning. The ALJ explicitly incorporated all of these considerations in assessing RFC.

The Magistrate finds that the ALJ fully considered Plaintiff's RFC assessment based on the evidence.  Even if the ALJ failed to include the mental limitation in assessing RFC, the error was harmless since in this case, there is no evidence that Plaintiff's mental impairment was of the severity to have an impact on her ability to do physical and mental work activities.

### 3. ABSENCES AND BEING OFF TASK AND ITS EFFECT ON HER RFC.

Plaintiff argues that the ALJ erred in failing to account for the possibility that she would be off task 20% of the time and likely to be absent for three days each month due to her depression.

The RFC finding in this case assesses what Plaintiff can do despite her impairments and it must therefore necessarily include Plaintiff's ability to attend work.  The Magistrate is persuaded that the ALJ did not err in failing to exclude excessive absenteeism or being off task in his RFC assessment.  Significantly, Plaintiff has failed to establish that excessive absenteeism or being off task is an existing impairment.  Neither has Plaintiff pointed to evidence in the record that suggests she could not stay on task nor attend work or that she is entitled to greater restrictions.  Plaintiff's mental impairment is well controlled with medication and it is not of the severity that it precludes an ability to regularly perform the duties of any job without significant interruption.  Moreover,

20

Plaintiff failed to provide a reasoned basis why a job involving qualifications in which she must use her own judgment to perform the work would require being off task for 20% of the day. In sum, Plaintiff has failed to provide meaningful evidence that distinguishes between the impairment related absenteeism and Plaintiff's self reported inabilities to attend work.

Plaintiff's opinions about absenteeism and being off task do not affect the depth of what Plaintiff can or cannot do in a work environment.  The ALJ did not err in failing to include such speculative notions in Plaintiff's RFC.

**B.    CREDIBILITY**.

Plaintiff contends that the ALJ improperly discounted her credibility.  Specifically, the ALJ failed to adduce testimony to resolve any inconsistencies in her testimony about her onset date, her inability to walk more than a block and her claim of social anxiety.

**1.    THE CREDIBILITY STANDARD OF REVIEW.**

An ALJ's "findings based on the credibility of the applicant are to be accorded great weight and deference." *Winning v. Commissioner of Social Security,* 661 F.Supp.2d 807, 822 (N.D.Ohio,2009) (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997)).  Such findings must, however, be supported by substantial evidence.  *Id*.  A claimant's credibility may be discounted, "to a certain degree," where an ALJ "finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Id*.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id*. at 823 (*citing Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007)).

The ALJ is not permitted to make credibility determinations based solely upon an "intangible

or intuitive notion about an individual's credibility." *Id.* at 822-823 (*citing Rogers, supra*; SSR 96–7p: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS)).  SSR 96–7p states that the ALJ's decision must contain specific reasons for the credibility determination and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  The ALJ must consider the objective medical evidence as well as the following factors when assessing the credibility of an individual's statements:

- The individual's daily activities.
- The location, duration, frequency, and intensity of the individual's pain or other symptoms.
- Factors that precipitate and aggravate the symptoms.
- The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms.
- Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms.
- Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board).
- Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, at *3.

**2.  THE CREDIBILITY FINDING.**

Plaintiff complains that when assessing credibility the ALJ should have given her a chance to explain the inconsistencies in her testimony and other written responses.

The Magistrate finds that Plaintiff puts forth no plausible alternate explanation for the inconsistencies and the ALJ was not required to scrupulously probe or explore any inconsistencies between Plaintiff's testimony and her written responses.  Neither was the ALJ required to address hypothetical alternate explanations for the inconsistencies in Plaintiff's testimony.

22

The ALJ's credibility determination was based on all of the evidence in the record.  The ALJ appropriately relied on the inconsistencies in Plaintiff's statements and complaints to support the ALJ's determination that she was not wholly credible.  This includes statements and reports from the individual about the individual's prior work record and efforts to return to work.  Plaintiff did not allege that she became unable to work because of her disabling condition on December 18, 2009.  Plaintiff claimed that she stopped on May 17, 2009, because she wanted to be home with her husband and spend more time with her grandchildren.  The ALJ did not find these facts in conflict but he found them instructive as to the severity of Plaintiff's impairments and work abilities (Docket No. 12, p. 20 of 451).

Similarly, the ALJ contrasted Plaintiff's testimony at the administrative hearing on November 17, 2011, that she could not walk a block, with her representation to Dr. Antonio Rosario on September 7, 2011, that she had sore knees after starting a walking program in which she covered 1.5 miles and her assertion in the BACKGROUND QUESTIONNAIRE completed on August 30, 2011 that she could walk a half block on a good day (Docket No. 12, pp. 57; 151; 404 of 451).

The ALJ's decision reflects that he did not merely "disregard" Plaintiff's allegations of constant pain but gave serious consideration to all of Plaintiff's subjective complaints as they related to the intensity and persistence of her knee pain.  The ALJ used this evidence to set forth at length the reasons that Plaintiff's claim with respect to her knees was insufficient to limit her RFC or entitle her to disability benefits (Docket No. 11, pp. 20-21 of 451).

Finally, the ALJ considered that Plaintiff rarely complained to her mental health care providers that she was affected by social anxiety.  When she did, it was to report that she had few difficulties with social anxiety.  Plaintiff testified that she camped with her family, babysat for her

grandchildren and planned her surgery around a social event.  The ALJ was persuaded by this evidence that Plaintiff's social anxiety was not of the severity, intensity, persistence or limiting effect as alleged.  It was imperative to the credibility determination that the ALJ considers the frequency, and intensity of Plaintiff's symptoms, the treatment she received for relief and any factors concerning Plaintiff's functional limitations and restrictions resulting therefrom.

Deference to the ALJ's assessment of this factor is the general rule and the Magistrate will not upset the credibility determination based on Plaintiff's alleged inconsistent statements, inability to walk and/or social anxiety as the ALJ has linked his credibility finding to substantial evidence by explaining why the specific evidence led him to conclude Plaintiff's subjective complaints were not credible.  The ALJ did not nitpick for inconsistencies in the testimony about Plaintiff's ability to walk or her social anxiety symptoms but based Plaintiff's credibility assessment on a common sense evaluation of all the evidence, including Plaintiff's demeanor and attitude at the administrative hearing.  Plaintiff has not shown this decision to be patently wrong.  Furthermore, the ALJ provided a reasonable explanation for his credibility determination.  Accordingly, the ALJ's credibility determination is conclusive.

## XI. CONCLUSION.

For these reasons, the Magistrate Judge affirms the Commissioner's decision.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   December 17, 2013.